# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIK SCHLARP,     )
           )
   **Plaintiff,**    )
           )
  **v.**        )  **Civil Action No. 06-1089**
           )
**PAUL DERN, STEVE TAYLOR, and** )
**PLUM BOROUGH,**    )
           )
   **Defendants.**   )

## MEMORANDUM OPINION

**CONTI, District Judge**

### Introduction

This case concerns a police officer, plaintiff Erik Schlarp ("plaintiff" or "Schlarp"), who contends that he was wrongfully denied a promotion in retaliation for his exercise of rights protected under the First and Fourteenth Amendments to the United States Constitution. Pending before the court is a motion for summary judgment filed by defendants Paul Dern, Steve Taylor and Plum Borough ("defendants"). For the reasons that follow, that motion will be granted.

### Background[1]

Pennsylvania has a statutory process for filling vacancies which arise in a borough police force. Each borough which maintains "a police force or paid fire apparatus operators" has a "civil service commission," which consists of three commissioners appointed by the borough council for terms of six years. 53 PA. STAT. ANN. § 46172. In a given borough, the civil service

---

[1]The background part of this opinion describes general factual and procedural matters. Other facts in evidence relating to a particular claim will be addressed in the part of the opinion which discusses that claim.

commission is empowered to promulgate, with the approval of the borough council, rules and regulations "providing for the examination of applicants for positions in the police force and as paid operators of fire apparatus and for promotions, which rules and regulations shall prescribe the minimum qualifications of all applicants to be examined and the passing grades." 53 PA. STAT. ANN. § 46181. The applicable statutory provision provides that "[a]ll examinations for positions or promotions shall be practical in character and shall relate to such matters and include such inquiries as will fairly test the merit and fitness of the persons examined to discharge the duties of the employment sought by them." *Id.* The borough council is to notify the civil service commission of any vacancy that needs to be filled, and to "request the certification of a list of eligibles." 53 PA. STAT. ANN. § 46184. For each vacancy, the civil service commission must list the names of the three individuals with the highest scores on examinations created by the commission. *Id.* The borough council, "with sole reference to the merits and fitness of the candidates," must fill the vacancy by choosing one of the three individuals on the list provided by the civil service commission.[2] *Id.*

---

[2]Pennsylvania has a separate statutory provision providing that "[p]romotions shall be based on merit to be ascertained by examinations to be prescribed by the commission." 53 PA. STAT. ANN. § 46188. The Pennsylvania Commonwealth Court recently construed this provision to mean that, in the case of a promotion (as opposed to an original appointment), the borough council must select the individual with the highest scores on the examinations, and that it has no discretion to choose the individual with the second- or third-highest scores. *Borough of Wilkinsburg v. Colella*, 961 A.2d 265, 266-69 (Pa. Commw. Ct. 2008). Since Schlarp was denied a "promotion" even though he had scored higher than his competitors for the position at issue, it may be that he was entitled to the promotion under Pennsylvania law. The parties in this case, however, apparently agree that the Plum Borough Council was permitted to choose any of the top three scorers. (Joint Concise Statement of Material Facts (A) ¶ 8.) The court will not address whether the Plum Borough Council had such discretion. Since Schlarp's claims are based on the First and Fourteenth Amendments to the United States Constitution, the question whether the provisions of Pennsylvania law were properly followed is not dispositive. It is axiomatic that an individual cannot establish a First Amendment violation merely by showing that he or she has been aggrieved by a violation of state law. *McCrerey v. Allen*, 118 F.3d 242, 243-45 (4th Cir. 1997).

Defendant Plum Borough ("Plum") enacted ordinances to effectuate its responsibilities under Pennsylvania law. Applicants for the position of sergeant are given a written examination evaluating their reasoning ability, problem solving skills, reading comprehension skills, observational skills, ability to read charts and maps, analytical skills and temperament. PLUM BOROUGH, PA. CODE OF ORDINANCES § 33.045. Applicants are also given an oral examination, which is directed toward determining whether a particular applicant is resourceful and otherwise able to handle the pressures experienced by sergeants on a routine basis. *Id.* The written examination is worth seventy points, and the oral examination is worth thirty points. *Id.* A minimum score of 70% on each examination is required of any applicant who wishes to receive consideration for an appointment to the position of sergeant. *Id.* Applicants who fail to complete successfully the written examination are not permitted to take the oral examination. *Id.*

Plum's Civil Service Commission ("Commission") is charged with the duty of tallying the weighted scores of the applicants and compiling a list of those eligible for appointment in the order of their combined scores. PLUM BOROUGH, PA. CODE OF ORDINANCES § 33.045. The Commission certifies to the Plum Borough Council ("Council") a promotional list which includes the three highest scorers for the first vacancy and the next highest scorer for each additional vacancy. *Id.* The Council selects an applicant from this list to fill the vacancy in question.

In 2005 Schlarp, a police officer employed by the Plum Borough Police Department ("Police Department"), was seeking to be promoted to the position of sergeant. On January 19, 2005, the Commission certified an eligibility list on which Schlarp was ranked second with a score of 79.7. (Defs.' Ex. C (Docket No. 37-5).) James Miller ("Miller") was ranked first with a

3

score of 81.9, Jay Kapusta ("Kapusta") was ranked third with a score of 79, Darryl Granata ("Granata") was ranked fourth with a score of 74.9, and Eric Fluent was ranked fifth with a score of 72.7. (*Id.*)

At the time of the personnel decision at issue, the members of the Council were Paul Dern ("Dern"), Richard Hereda ("Hereda"), Jeffrey Russo ("Russo"), Steve Taylor ("Taylor"), Don Flickinger ("Flickinger"), Russ Oft ("Oft"), and Chuck McMeekin ("McMeekin"). On May 9, 2005, the Council unanimously approved a motion to promote Miller to the position of sergeant. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-9.) At the same meeting, Russo made a motion to fill a second sergeant vacancy by promoting Kapusta. (*Id.*) That motion was seconded by Taylor. (*Id.*) Oft made a motion to table the matter, inquiring as to why Schlarp, who had received a higher score than Kapusta, was not receiving the promotion. (*Id.*) Oft was supported by Flickinger and McMeekin. (*Id.*) Russo expressed the view that Kapusta was the best remaining candidate for the position. (*Id.*) Plum Mayor John Schmeck ("Schmeck") recommended that Kapusta receive the promotion. (*Id.*) Kapusta received the support of Dern, Hereda, Russo and Taylor. (*Id.*) Oft, Flickinger and McMeekin opposed the move. (*Id.*) Kapusta was officially appointed as a sergeant at a subsequent meeting held on July 11, 2005. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-10.) Flickinger and McMeekin voted against the appointment. (*Id.*) Oft was apparently absent on that occasion. (*Id.*)

Schlarp commenced this action against Dern, Hereda, Russo, Taylor and Plum on August 17, 2006, alleging that they had violated his rights under the First and Fourteenth Amendments to the United States Constitution, as well as his rights under 42 U.S.C. § 1985, by failing to

promote him on the basis of his political affiliation.  (Complaint ("Compl.")(Docket No. 1).)  His

constitutional claims were brought pursuant to 42 U.S.C. § 1983.  (*Id.*)  The case was assigned to

a district judge.[3]  The defendants filed a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6) on October 16, 2006.  (Motion to Dismiss ("Mot. to Dismiss") (Docket No.

6).)

On January 17, 2007, while the motion to dismiss was still pending, the parties filed a

stipulation which provided as follows:

> It is hereby stipulated that any claims pursuant to 42 U.S.C.A. § 1983 alleged in
> Plaintiff's Complaint based on or arising out of the political affiliation of Erik
> Schlarp or any of the Defendants is withdrawn with prejudice from this suit.  It is
> also stipulated that any claims for conspiracy pursuant to 42 U.S.C.A. § 1985
> based on or arising out of the political affiliation of Erik Schlarp or any of the
> Defendants is withdrawn with prejudice from the suit.  It is finally stipulated that
> the above stipulations in no way impact the remaining disputed issues raised in
> the Defendants' pending 12(b)(6) Motion.

(Docket No. 17-2.)  The district judge partially granted the motion to dismiss on April 2, 2007.

(Docket No. 18.)  The First Amendment claims against Hereda and Russo were dismissed

without prejudice.  (*Id.*)  The Fourteenth Amendment claims (except to the extent that the

Fourteenth Amendment was relied upon as the basis for applying the First Amendment to state

actors) were dismissed with prejudice, as were the § 1985 claims.  (*Id.*)  The motion to dismiss

was denied with respect to the First Amendment claims against Dern, Taylor and Plum. (*Id.*)

Schlarp was given until April 18, 2007, to file an amended complaint setting forth First

Amendment claims against Hereda and Russo.  (*Id.*)

---

[3]The district judge who was initially assigned this case was later elevated to the United States Court of
Appeals for the Third Circuit.

On April 18, 2007, the case was reassigned to the undersigned judge. (Docket No. 21.)

Schlarp never amended his complaint to assert claims against Hereda and Russo. On April 25,

2007, the court issued an order indicating that the claims against Hereda and Russo were being

dismissed with prejudice. (Docket No. 23.) The defendants filed a motion for summary

judgment on May 22, 2008. (Motion for Summary Judgment ("Mot. for Summ. J.") (Docket No.

38.)) That motion is the subject of this memorandum opinion.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if,

drawing all reasonable inferences in favor of the nonmoving party, "the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P.

56(c). A motion for summary judgment will not be defeated by the mere existence of some

disputed facts, but will be defeated only if there is a genuine issue of material fact. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether a dispute is genuine,

the court's function is not to weigh the evidence or to determine the truth of the matter, but only

to determine whether the evidence of record is such that a reasonable jury could return a verdict

for the nonmoving party. *Id.* at 249.

### *Discussion*

Before addressing the matters in contention, the court notes that Schlarp brings his claims

pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the

> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress, except that in
> any action brought against a judicial officer for an act or omission taken in such
> officer's judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was unavailable. For
> purposes of this section, any Act of Congress applicable exclusively to the District
> of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. This statute does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129 n.11 (1980). A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federally protected right. *Collins v. City of Harker Heights*, 503 U.S. 115, 119-20 (1992). "Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (internal quotation marks omitted).

All the remaining claims in this case are based upon the First Amendment. The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting
> the free exercise thereof; or abridging the freedom of speech, or of the press; or
> the right of the people peaceably to assemble, and to petition the Government for
> a redress of grievances.

U.S. CONST. AMEND. I. The provisions of the First Amendment are applicable to state actors by virtue of the Due Process Clause of the Fourteenth Amendment. *United Bhd. of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 831 (1983).

## A.    The Administrative Nature of the Council's Personnel Decision

Although the language of § 1983 speaks of "immunities secured by the Constitution and laws," 42. U.S.C. § 1983, the United States Supreme Court has always assumed that Congress would have expressly made common-law immunities inapplicable to § 1983 actions within the

statutory text if it had intended to do so.  *Pierson v. Ray*, 386 U.S. 547, 554-55 (1967).  For this

reason, the absolute immunity that was available to legislators at common law remains available

to legislators who are sued under § 1983.  *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951).  This

immunity extends to local legislators such as Dern and Taylor.  *Bogan v. Scott-Harris*, 523 U.S.

44, 49 (1998).  Courts have developed a functional approach to legislative immunity which

immunizes legislators from suit for actions that are truly legislative in nature while permitting

legislators to be sued for their administrative actions.  *Fowler-Nash v. Democratic Caucus of the

Pennsylvania House of Representatives*, 469 F.3d 328, 337-40 (3d Cir. 2006).  This functional

approach, which likewise applies to other forms of absolute governmental immunity, ensures that

an official's immunity shields only those actions which are performed as a part of his or her

official duties.  *Clinton v. Jones*, 520 U.S. 681, 693-95 (1997).  Although the creation or

elimination of a position is generally viewed as a legislative action, a personnel decision

involving only a single employee (such as a decision to hire, fire, promote or not promote an

individual) is properly classified as an administrative action that is not shielded by absolute

immunity.  *Bogan*, 523 U.S. at 56 ("Moreover, it involved the termination of a position, which,

*unlike the hiring or firing of a particular employee*, may have prospective implications that reach

well beyond the particular occupant of the office.")(emphasis added); *Fowler-Nash*, 469 F.3d at

340 ("Neither Harhai nor Brubaker nor the Caucus were acting in a legislative capacity when

they terminated Fowler-Nash.  Harhai's decision did not reach beyond a single employee.  It did

not eliminate Fowler-Nash's position, thereby affecting future employees.").

   In this case, Schlarp challenges the Council's decision to promote Kapusta instead of

him.  He does not challenge the Council's decision to create or eliminate a position.  Thus, the

personnel decision at issue here is properly characterized as an administrative action (rather than as a legislative action). The analysis is not altered by the decision to promote Kapusta (and to not promote Schlarp) being effectuated by a vote of the Council. *Zdziebloski v. Town of East Greenbush*, 336 F.Supp.2d 194, 203 (N.D.N.Y. 2004)("However, the failure to rehire Zdziebloski and the requirement that a release be signed prior to disbursing accrued benefits is not protected by legislative immunity because those are not legislative activities, *even when such actions are taken by a vote of legislators*.")(emphasis added)). Dern and Taylor do not enjoy absolute immunity from suit for their decision to promote Kapusta instead of Schlarp.

**B.     The Evidence of Factionalism Within the Plum Police Department**

The First Amendment bases for Schlarp's claims are complicated by the stipulation of January 17, 2007, which withdrew from this lawsuit "any claims" pursuant to § 1983 alleged in the complaint "based on or arising out of the political affiliation of Erik Schlarp or any of the Defendants." (Docket No. 17-2.) The four members of the Council who voted to promote Kapusta were all Democrats, while the three members of the Council who voted against the promotion were all Republicans. (Compl. ¶¶ 11-12.) Schlarp is a Republican. (*Id.* ¶ 12.) When he commenced this action, Schlarp apparently believed that Dern, Russo, Hereda and Taylor had passed him over for promotion because of his party affiliation. In his deposition, Schlarp, however, acknowledged that both Miller and Kapusta were Republicans. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-1; Schlarp Dep. 33-34.)

Schlarp's remaining First Amendment claims are based upon an alleged history of factionalism in Plum. Schmeck became the mayor of Plum in 1998, and he held that office the until January 2006. (Joint Concise Statement of Material Facts (B) ¶ 7.) Terry Focareta ("Chief

Focareta") became the chief of the Police Department in 1996. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-20.) The first incident alleged by Schlarp occurred on March 28, 1997, when Schlarp stopped a male individual for speeding. (Joint Concise Statement of Material Facts (B) ¶ 1.) The male happened to be the husband of Valerie Yockey ("Yockey"), who was the president of the Council. (*Id.*) Yockey allegedly asked Schlarp not to issue a citation to her husband. (*Id.* ¶ 2.) Schlarp spoke to Chief Focareta about the matter. (*Id.*) Believing Yockey's request to be improper, Focareta instructed Schlarp to issue a report. (*Id.* ¶ 3.) When Focareta told Yockey that her request had been improper, she allegedly laughed at him. (*Id.*) This exchange prompted Chief Focareta to report Yockey's conduct to the Pennsylvania State Ethics Commission ("Ethics Commission"). (*Id.*) Schlarp participated as a witness in the Ethics Commission's investigation into Yockey's conduct. (Compl. ¶ 18.) Yockey was not re-elected after the expiration of her term, allegedly due to bad publicity stemming from the incident involving her husband and Schlarp. (*Id.* ¶ 19.) Yockey currently serves as the chairperson of the Plum Borough Democratic Committee. Plum Borough Democratic Committee, www.freewebs.com/plumdemocrat/index.htm (last visited February 26, 2009).

In 1998, Schmeck accused Detective James Farmerie ("Farmerie"), Detective Mark Focareta ("Detective Focareta") and Patrolman Ryan Schneiderlochner ("Schneiderlochner") of cheating on a civil service examination. (Joint Concise Statement of Material Facts (B) ¶ 9.) Detective Focareta is Chief Focareta's son. (*Id.* ¶ 43.) The Commission "completely exonerated" the three accused individuals, calling the accusations made by Schmeck "warrantless, scurrilous, unfounded, and lacking in any factual support." (App. to Pl.'s Counterstatement of Material Facts, Ex. P-17.)

On January 20, 1999, Schlarp filed a grievance concerning police officers' use of compensatory time. (Compl. ¶ 20.) In response to the grievance, the Council altered the Police Department's compensatory use policy. (*Id.* at ¶ 21.) Schmeck allegedly made public statements indicating his displeasure with Schlarp's filing of the grievance. (*Id.*)

Schmeck and Schlarp clashed during the summer of 2000. Schmeck allegedly started to verbally harass Schlarp on July 10, 2000, prompting Schlarp to threaten Schmeck with arrest. (Compl. ¶ 23.) Schlarp informed Chief Focareta about the incident. (*Id.* at ¶ 24.) A report was filed, and the matter was reported by the news media. (*Id.* ¶ 25.) That same month, Schmeck sought Schlarp's termination in connection with an incident involving dogs. (Joint Concise Statement of Material Facts (B) ¶ 12, 14.) While Schlarp was taking an off-duty walk, some loose dogs approached him. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-4, Schneiderlochner Dep. 32-36.) Schlarp apparently drew his gun and fired a warning shot into the ground, scaring the dogs away. (*Id.*) In August 2000, at Schmeck's urging, the Council terminated Schlarp's employment because of this incident. (Joint Concise Statement of Material Facts (B) ¶ 13.) Schlarp filed a grievance. (*Id.* ¶ 14.) He was reinstated in November 2000 after the Commission determined that he had appropriately acted in self-defense. (*Id.*) Unhappy with Schlarp's reinstatement, Schmeck allegedly attempted to coax Chief Focareta into suspending Schlarp for a period of thirty days. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-20.) Seeking to preempt further action by Schmeck, Chief Focareta placed a reprimand in Schlarp's confidential file, which was to be removed one year later. (*Id.*)

In February and March 2001, Schlarp participated in written and oral testing in order to qualify for promotion to a sergeant position. (Joint Concise Statement of Material Facts (B) ¶

20.)  His combined score gave him a third-place ranking on the list of eligibles.  (*Id.*)  The Council voted to promote the first- and second-ranked applicants on April 9, 2001.  (*Id.* ¶ 21.)

Dern, Hereda, Russo and Taylor were elected to the Council in 2001, and they assumed office in January 2002.  (*Id.* ¶ 22.)  Shortly after these four individuals took office, the Council voted to discharge Chief Focareta.  (*Id.* ¶ 28.)  Sergeant Matthew Feldmeier ("Feldmeier") became the acting chief.  (*Id.* ¶ 29.)  Feldmeier sought to have Schlarp appointed as the coordinator of a drug enforcement detail that was operating in conjunction with the Allegheny County District Attorney's Office.  (*Id.*)  Schlarp's immediate supervisor, Sergeant Richard Kudranski ("Kudranski"), recommended him for the position.  (*Id.* ¶ 30.)  Schlarp, however, was not only denied the opportunity to serve as the coordinator of the drug enforcement detail, but was also denied the chance to become a member of it.  (*Id.* ¶ 31.)  Schlarp attributes his failure to obtain the appointment to Schmeck.  (*Id.*)

In January 2002, the Council appointed Dennis Daugherty ("Daugherty"), a deputy patrolman, to the Commission.  (*Id.* ¶ 33.)  Daugherty allegedly disliked Chief Focareta, and he apparently disliked Schlarp because of his amicable relationship with Chief Focareta.[4]  (*Id.* ¶ 35.)  Meanwhile, Chief Focareta commenced an action in this court against Schmeck, Dern, Hereda, Russo and Taylor, alleging that their termination of him violated the First and Fourteenth

---

[4]In his complaint, Schlarp intimates (but does not specifically allege) that Daugherty's alleged hostility toward him may have impacted his score on his oral examination.  (Compl. ¶ 53 ("Obviously, Plaintiff was not interviewing in front of a fair and impartial panel.").)

Amendments to the United States Constitution and Pennsylvania's Whistleblower Statute.[5]

Complaint, *Focareta v. Schmeck*, No. 02-cv-245 (W.D.Pa. Jan. 28, 2002).

On September 9, 2002, the Council unanimously voted to promote Lanny Conly ("Conly") to the position of sergeant. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-6.) This action followed a statement by Russo that he had received a certified list of candidates from the Commission. (*Id.*) Schlarp contends that Conly was the fourth-ranked candidate on the list of eligibles presented by the Commission in 2001. (Joint Concise Statement of Material Facts (B) at ¶ 36.) Schlarp was the third-ranked candidate on that list. (*Id.*)

Schlarp alleges that, after Chief Focareta's termination, police officers who were perceived to be Chief Focareta's supporters were subjected to retaliatory actions. (*Id.* ¶ 38.) Schlarp, Kudranski and Schneiderlochner were allegedly denied the opportunity to participate in training programs that were available to other Plum police officers. (*Id.* ¶ 40.) On one occasion, Schneiderlochner was charged with making anonymous, harassing telephone calls to Schmeck. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-4; Schneiderlochner Dep. at 22-23.) A jury acquitted Schneiderlochner of the charges after deliberating for only ten to fifteen minutes. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-3; Kudranski Dep. at 35-36.)

---

[5]Pennsylvania's Whistleblower Statute provides:
§ 1423. Protection of employees
(a) **Persons not to be discharged.**–No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.
(b) **Discrimination prohibited.**–No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee is requested by an appropriate authority to participate in an investigation, hearing or inquiry held by an appropriate authority or in a court action.
43 Pa. Stat. Ann. § 1423.

During the summer of 2003, Robert Payne ("Payne") was hired to replace permanently Chief Focareta. (Joint Concise Statement of Material Facts (B) ¶ 41.) On October 1, 2003, Chief Focareta obtained a favorable verdict in his action against Schmeck, Dern, Hereda, Russo and Taylor. (*Id.* at ¶ 42.) Several Plum police officers signed a letter dated October 7, 2003, to the district judge who presided over that case dated October 7, 2003, urging the judge not to reinstate Chief Focareta.[6] (App. to Pl.'s Counterstatement of Material Facts, Ex. P-1.) Detective Focareta, who is Chief Focareta's son, refused to sign the letter. (Joint Concise Statement of Material Facts (B) ¶ 43.) Schlarp, Kudranski and Schneiderlochner also refused to sign the letter. (*Id.*) Shortly thereafter, Detective Focareta was demoted. (*Id.* ¶ 44.) He was eventually reinstated. (*Id.*) Schlarp served as the chairman of Detective Focareta's grievance committee. (Compl. ¶ 34.) Schneiderlochner was terminated on October 10, 2005, after being accused of work-related misconduct. Complaint, Docket No. 1-4, at 4 ¶¶ 5-6, *Schneiderlochner v. Plum Borough*, No. 08-cv-843 (W.D.Pa. June 19, 2008). He was reinstated on December 15, 2006, pursuant to a favorable arbitral decision. (*Id.* ¶ 7.)

Chief Focareta submitted a declaration stating that Schmeck had been hostile to him because he had convinced the Allegheny County District Attorney's Office to wiretap Schmeck for the purpose of investigating Schmeck's alleged efforts to pressure Farmerie to "fix" a case under investigation. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-20, ¶ 7.) Although Chief Focareta's declaration did not describe the circumstances surrounding the case, the court understands the "case" mentioned in the declaration referred to a situation in which Farmerie was

---

[6]Schlarp alleges that an earlier letter to that judge had been circulated in March 2003, and that he had refused to sign that letter as well. (Compl. ¶¶ 26-27.) That letter apparently was not produced during discovery.

investigating an allegation that a girl had been beaten. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-13 at 208-09.) Schmeck apparently suggested to Farmerie that the girl had not actually been beaten, but that she had injured herself while falling off a bicycle. (*Id.*) During the trial in Chief Focareta's action, Schmeck testified that his comments to Farmerie had been a pretext for securing a meeting with Farmerie to discuss other matters. (*Id.*) Chief Focareta in his declaration also stated that Schmeck had repeatedly attempted to undermine his driving under the influence ("DUI") enforcement operations. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-20, ¶¶ 8-10.) Schmeck allegedly wanted to discontinue the Police Department's use of sobriety checkpoints to catch DUI-related offenders. (*Id.* ¶ 8.) According to Chief Focareta, Schmeck attempted to discover the secret locations of the sobriety checkpoints so that he could advise his friends and acquaintances to avoid them. (*Id.* ¶ 10.) Kudranski was Plum's DUI enforcement coordinator, and both Schlarp and Schneiderlochner were participants in the program. (*Id.* ¶ 11.)

## C. The Different First Amendment Doctrines Implicated by Schlarp's Claims

Schlarp attributes the Council's decision to promote Kapusta, rather than him, to his association with the faction of the Police Department loyal to Chief Focareta. While it is clear that Schlarp bases his claims on the First Amendment, the nature of his pleadings makes it difficult to ascertain exactly what kind of First Amendment claim he is trying to pursue. (Compl. ¶¶ 66-68, 72-74, 78-80, 84-86.) In order to dispose of the pending motion for summary judgment, the court will address plaintiff's claims after considering the submissions and will examine the applicable jurisprudence.

Like many phrases employed in legal parlance, the term "freedom of association" can be utilized in different contexts. In *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984), the Supreme Court identified a distinction between's one's freedom of "intimate association" and his or her freedom of "expressive association." While both freedoms are firmly embedded within the Supreme Court's jurisprudence, only the freedom of expressive association is based upon the First Amendment. One's freedom of intimate association, which is based on the Due Process Clause of the Fourteenth Amendment, recognizes as "an intrinsic element of personal liberty" the right of an individual to develop deeply personal attachments with other individuals.[7] *Id.* at 620. Associations entitled to this unique form of constitutional protection are characterized by such attributes as "relative smallness," "a high degree of selectivity," and "seclusion from others in critical aspects of the relationship." *Id.* The Due Process Clause has generally been construed to protect one's right to marry, to procreate, to associate with family members, to rear children, and

---

[7]The right of intimate association is properly characterized as a substantive due process right. *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993); *O'Donnell v. Brown*, 335 F.Supp.2d 787, 820 (W.D.Mich. 2004); *Flaskamp v. Dearborn Public Schools*, 232 F.Supp.2d 730, 740 (E.D.Mich. 2002); *Hill v. Martinez*, 87 F.Supp.2d 1115, 1118 (D.Colo. 2000). A plain reading of *Roberts* indicates that the Supreme Court grounded the right of intimate association in the Due Process Clause's protection of fundamental liberties. *Roberts v. United States Jaycees*, 468 U.S. 609, 619 (1984)("Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty."). Courts frequently mischaracterize this right as a First Amendment right. *Thompson v. Adams*, 268 F.3d 609, 614 (8th Cir. 2001); *Wallace v. Texas Tech University*, 80 F.3d 1042, 1051 (5th Cir. 1996); *Parks v. City of Warner Robins*, 43 F.3d 609, 611-618 (11th Cir. 1995); *Freebury v. Coons*, 589 F.Supp.2d 409, 421 (D.Del. 2008). Perhaps this confusion is due, in some instances, to the right of intimate association (which includes the right of parents to rear their children) overlapping with a distinct right grounded in the First Amendment (such as the right of parents to raise their children according to the dictates of their religious convictions). *Combs v. Homer-Center School District*, 540 F.3d 231, 243-44 (3d Cir. 2008); *Leebaert v. Harrington*, 332 F.3d 134, 135-145 (2d Cir. 2003). An "intimate expression" may be simultaneously protected under the Due Process Clause because of its intimate nature and under the Free Speech Clause because of its expressive nature. *Dible v. City of Chandler*, 515 F.3d 918, 929 (9th Cir. 2008). For analytical purposes, it is important to make a distinction between the right of intimate association, which is grounded in the Due Process Clause, and the distinct right of expressive association, which is grounded in the Free Speech Clause. *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003); *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997). The lack of mutual exclusivity between the categories of conduct protected by these distinct constitutional rights does not mean that the rights themselves spring from the same source.

16

to become involved in consensual sexual relationships. *Lawrence v. Texas*, 539 U.S. 558, 573-74 (2003). Schlarp's claims are not based on a deep personal relationship with another person or group of persons. Instead, they are based on what the Supreme Court has referred to as one's right of expressive association.

As the Supreme Court observed in *Roberts*, "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622. Federal courts "have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* This right of expressive association, unlike the distinct right of intimate association, is grounded in the First Amendment. To the extent that Schlarp asserts claims based upon his "freedom of association," the court understands them to be grounded in his right of expressive association rather than in his right of intimate association.

In *Elrod v. Burns*, 427 U.S. 347, 372-73 (1976)(plurality opinion), the Supreme Court held that it was unconstitutional under the Free Speech Clause for a public employer to dismiss an employee on the basis of his or her political affiliation. This rule was refined in *Branti v. Finkel*, 445 U.S. 507 (1980), in which the Supreme Court held that a public employee's party affiliation could serve as the basis for his or her dismissal only upon a showing that his or her affiliation with a particular party was "an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518. The prohibition was extended to hiring,

promotion, transfer and recall decisions in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 65 (1990), in which the Supreme Court held that a public employer could not constitutionally discriminate on the basis of political affiliation when filling positions for which party affiliation was not an appropriate requirement. Similar constitutional protections were extended to independent contractors servicing governmental entities in *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 673 (1996), and *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 714-15 (1996). As noted earlier, Schlarp stipulated to the dismissal of his claims to the extent that they were based on his being a Republican. The rationale employed in *Rutan*, however, is not limited to strictly partisan affiliations, but extends to similar affiliations reflecting a "commonality of political purpose and support." *Williams v. City of River Rouge*, 909 F.2d 151, 153 n.4 (6th Cir. 1990). Indeed, "the First Amendment protects politically neutral or apolitical government employees from political patronage discrimination." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 276 (3d Cir. 2007). To the extent that Schlarp alleges that he was not selected for promotion because of his association with the faction of the Police Department loyal to Chief Focareta, the court understands his claims to be based on the Free Speech Clause under a rationale similar to that adopted in *Rutan*.

In a distinct line of decisions, the Supreme Court has delineated the scope of a public employee's right under the Free Speech Clause to speak without fear of retaliation by his or her employer. For decades, it was generally accepted that the Constitution did not impose limits on a public employer's ability to condition public employment on a public employee's willingness to refrain from engaging in constitutionally protected activities. *Adler v. Bd. of Educ.*, 342 U.S. 485, 492 (1952)("They may work for the school system upon the reasonable terms laid down by

the proper authorities of New York. If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere."). In more recent times, however, the Supreme Court has recognized that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). The constitutionality of employment-related discipline imposed on a public employee in retaliation for speech is not always examined in accordance with the standards applicable to speech restrictions imposed by the government on members of the general population. *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004)(observing that a public employer may constitutionally impose restrictions on the speech of its employees "that would be unconstitutional if applied to the general public"). The ability to impose those kind of restrictions is appropriate because "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters v. Churchill*, 511 U.S. 661, 675 (1994)(plurality opinion).

The framework employed by courts to test the constitutionality of employer discipline in retaliation for speech had its genesis in *Pickering v. Board of Education*, 391 U.S. 563 (1968), which was decided by the Supreme Court four decades ago. In *Pickering*, the Supreme Court explained:

> "The theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Keyishian v. Board of Regents*, [385 U.S. 589, 605-606 (1967)]. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the

> interest of the State, as an employer, in promoting the efficiency of the public
> services it performs through its employees.

*Pickering*, 391 U.S. at 568. Given the language in *Pickering*, it is clear that a public employee's

right to be free from employer discipline in retaliation for speech protects only his or her interest

in speaking *as a citizen* about *matters of public concern*. Where implicated, it is *this* interest

which must be weighed against the employer's interest in "promoting the efficiency of the public

services it performs through its employees." *Id.* Where a public employee does not speak *as a*

*citizen* about *matters of public concern*, there is nothing to balance against the competing

interests of the public employer.[8] *Roe*, 543 U.S. at 82 ("*Pickering* did not hold that any and all

statements by a public employee are entitled to balancing. To require *Pickering* balancing in

every case where speech by a public employee is at issue, no matter the content of the speech,

could compromise the functioning of government offices.").

---

[8]The unique constitutional protection afforded to speech uttered by public employees under *Pickering* is more narrow than the constitutional protection afforded to speech uttered by members of the general public. Public employees, however, enjoy the same First Amendment protection from sovereign governmental actions as do members of the general population. In *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court observed that "an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street." *Connick*, 461 U.S. at 147. The mere fact that a public employee's speech lacks constitutional protection from *employment-related discipline* (i.e., termination, reprimand, denial of promotion, etc.) does not mean that a government could use its *sovereign* authority to impose additional sanctions (i.e., imprisonment, probation, fine, professional censure or discipline, etc.) in retaliation for the same speech. Of course, speech that is categorically unprotected under the Free Speech Clause is *ipso facto* unprotected under *Pickering*. *Jarman v. City of Northlake*, 950 F.Supp. 1375, 1379 n.6 (N.D.Ill. 1997). A public employee could be terminated and prosecuted for inciting others to riot, possessing child pornography depicting real children, or using "fighting words." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 504-05 (1984)(recognizing defamation, fighting words, incitement to riot, obscenity, and child pornography as unprotected categories of speech). Where speech falls within the general ambit of First Amendment protection, but outside the more narrow protection afforded to a public employee's speech under *Pickering*, the employee's speech may justify the imposition of employment-related discipline by his or her employer even though it may not provide a basis for holding the employee criminally or civilly liable. *Bose Corp.*, 466 U.S. at 504 n.22 ("Statements made by public employees in their employment capacity and not touching on matters of public concern may be considered unprotected *in the sense that employment-related sanctions may be imposed on the basis of such statements*.")(emphasis added).

A First Amendment retaliation case has two general components. The first component concerns the issue of constitutional protection from employer discipline under *Pickering*, while the second component concerns the issue of causation. In order to enjoy constitutional protection from employer discipline, speech uttered by a public employee must be made (1) in his or her capacity *as a citizen* (i.e., not pursuant to his or her official duties); (2) addressing a matter of *public concern* (i.e., not a matter of purely private interest) (3) under circumstances in which, on *balance*, his or her interest in speaking outweighs his or her employer's interest in promoting workplace efficiency. *Garcetti*, 547 U.S. at 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); *Connick v. Myers*, 461 U.S. 138, 146 (1983)("When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."); *Pickering*, 391 U.S. at 568 ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."). The "as a citizen" inquiry presents a mixed question of law and fact. *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007). The "public concern" and "balancing" tests present questions of law for the court to decide. *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005).

If it is determined that a public employee's speech enjoys constitutional protection from employer discipline, the employee must establish causation between his or her speech and the

relevant adverse action alleged to have been retaliatory. In *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), the Supreme Court explained:

> A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Id.* at 286. In order to establish causation, a public employee asserting a First Amendment retaliation claim against his or her employer must first establish that his or her constitutionally protected speech was a substantial or motivating factor behind the challenged retaliatory action. *Id.* at 287. If the public employee makes such a showing, the burden shifts to the public employer to establish by a preponderance of the evidence that it would have taken the same action in the absence of the employee's constitutionally protected speech. *Id.* The issue of causation is a question of fact for the jury to decide. *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001). This same kind of causation inquiry is applicable to freedom of association claims under *Rutan*. *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997).

In *Wooley v. Maynard*, 430 U.S. 705 (1977), the Supreme Court declared that the "freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714. To the extent that Schlarp's claims are based on his refusal to sign the letter to the district court requesting that Chief Focareta not be reinstated, the court understands his claims to be based on the Free Speech Clause under the rationale employed in *Pickering* and its progeny. Regardless whether Schlarp's refusal to sign the letter is properly characterized as pro-Focareta "speech" or constitutionally protected silence, the Free Speech Clause is implicated in this case.

Schlarp also bases his First Amendment claims, at least in part, on alleged retaliation for

formal grievances initiated by him. (Compl. ¶ 22.) The filing of a grievance through a

governmental channel established for that particular purpose constitutes activity protected under

the Petition Clause. *San Filippo v. Bongiovanni*, 30 F.3d 424, 442 (3d Cir. 1994)("But when

government–federal or state–formally adopts a mechanism for redress of those grievances for

which government is legally accountable, it would seem to undermine the Constitution's vital

purposes to hold that one who in good faith files an arguably meritorious 'petition' invoking that

mechanism may be disciplined for such invocation by the very government that in compliance

with the petition clause has given the particular mechanism its constitutional imprimatur."). A

public employee who files a formal petition enjoys First Amendment protection from employer

discipline even if the "speech" contained within that petition does not involve a "matter of public

concern" for purposes of the *Pickering* test. *Id.* at 438-43. Consequently, Schlarp's filing formal

grievances constituted activity protected under the First Amendment regardless whether the

speech contained within those grievances would be entitled to protection under *Pickering* if it

had simply been uttered by Schlarp in a different context.[9]

In *Curinga v. City of Clairton*, 357 F.3d 305, 309-14 (3d Cir. 2004), the United States

Court of Appeals for the Third Circuit indicated that, at least in most cases involving both

freedom of speech claims under *Pickering* and freedom of association claims under *Rutan*, the

_____

[9]Speech that is categorically unprotected under the First Amendment does not become "protected" merely
because it is contained within a petition. *McDonald v. Smith*, 472 U.S. 479, 480-85 (1985). Individuals who file
petitions can sometimes be held accountable for the speech contained within such petitions. *Curry v. Hall*, 839
F.Supp. 1437, 1440 (D.Or. 1993). The court does not mean to suggest that an employee could never be discharged
(or otherwise punished) because of speech contained within a formal petition. In the present context, the court is
simply pointing out that because the Petition Clause affords individuals a right separate and distinct from that
protected under the Free Speech Clause, the viability of a claim under the Petition Clause does not depend upon
whether the specific criteria enunciated in *Pickering* and its progeny have been satisfied. *San Filippo v.
Bongiovanni*, 30 F.3d 424, 438-43 (3d Cir. 1994).

*Pickering* balancing test provides the more appropriate framework for decision making.  The

reasoning employed by the court of appeals in *Curinga* has its genesis in the following passage

from *O'Hare*:

> *Elrod* and *Branti* involved instances where the raw test of political affiliation
> suffced to show a constitutional violation, without the necessity of an inquiry
> more detailed than asking whether the requirement was appropriate for the
> employment in question.  There is an advantage in so confining the inquiry where
> political affiliation alone is concerned, for one's beliefs and allegiances ought not
> to be subject to probing or testing by the government.  It is true, on the other hand,
> as we stated at the outset of our opinion, *supra*, at 714, that the inquiry is whether
> the affiliation requirement is a reasonable one, so it is inevitable that some case-
> by-case adjudication will be required even where political affiliation is the test the
> government has imposed.  A reasonableness analysis will also accommodate those
> many cases, perhaps including the one before us, where specific instances of the
> employee's speech or expression, which require balancing in the *Pickering*
> context, are intermixed with a political affiliation requirement.  In those cases, the
> balancing *Pickering* mandates will be inevitable.  This case-by-case process will
> allow the courts to consider the necessity of according to the government the
> discretion it requires in the administration and awarding of contracts over the
> whole range of public works and the delivery of governmental services.

*O'Hare*, 518 U.S. at 719-20.  The court gleans from this language the principle that where the

*Pickering* framework is employed in a case involving First Amendment claims based upon both

speech and political association, the balancing of the competing interests should account for the

factors relevant to the respective inquiries under both *Pickering* and *Rutan*.[10]  *Camacho v.*

*Brandon*, 317 F.3d 153, 161 (2d Cir. 2003)("Thus, while a plaintiff's policymaking role does not

provide a defendant 'with complete insulation' for any retaliatory action, it does 'weigh,

---

[10]In a case involving an allegation that a public employer has taken an adverse action against an employee
or applicant for employment because of his or her political affiliation, the burden is on the public employer to
demonstrate that affiliation with a particular political party, faction or ideology is an appropriate requirement for the
particular position at issue.  *Armour v. County of Beaver*, 271 F.3d 417, 420 (3d Cir. 2001).  Where, as here, a
public employee alleges that his or her employer has taken a retaliatory action based on both his or her political
association and his or her expressive conduct, the "appropriate requirement" inquiry is subsumed by the *Pickering*
balancing test.  *Curinga v. City of Clairton*, 357 F.3d 305, 312 (3d Cir. 2004)("The government's interest in
appointing politically loyal employees to policymaking positions converges with its interest in running an efficient
workplace.").

normally heavily,' on the defendant's side in the *Pickering* balance."). Because this case also involves conduct protected under the Petition Clause, however, even this broader application of the *Pickering* framework cannot fully account for all the First Amendment interests at stake. The court must independently evaluate the degree of constitutional protection afforded to each instance of conduct engaged in by Schlarp that is implicated in his claims..

**D.      The Extent to Which Schlarp's Activities Enjoyed Constitutional Protection from Employment-Based Retaliation**

The incident involving Yockey must be analyzed in two distinct parts. By stopping Yockey's husband and later reporting Yockey's alleged inappropriate plea for leniency to Chief Focareta, Schlarp was not engaging in speech "as a citizen." He was simply doing his job. *Vose v. Kliment*, 506 F.3d 565, 572 (7th Cir. 2007); *Sigsworth v. City of Aurora*, 487 F.3d 506, 507-11 (7th Cir. 2007). His "speech" to Chief Focareta concerning Yockey's conduct was not entitled to the narrow degree of constitutional protection afforded to public employees under *Pickering*. The same, however, cannot be said about his participation as a witness in the Ethics Commission's investigation into the matter. In *Reilly v. City of Atlantic City*, 532 F.3d 216 (3d Cir. 2008), the United States Court of Appeals for the Third Circuit declared that "the act of offering truthful testimony is the responsibility of every citizen, and [that] the First Amendment protection associated with fulfilling that duty of citizenship is not vitiated by one's status as a public employee." *Reilly*, 532 F.3d at 231. Pursuant to the reasoning employed in *Reilly*, Schlarp's participation as a witness in the Ethics Commission's investigation into Yockey's conduct constituted activity protected under the First Amendment.

As noted earlier, Schlarp's filing of formal grievances constituted activity protected under the Petition Clause. *San Filippo*, 30 F.3d at 442. For this reason, the Constitution protected both

his grievance of January 20, 1999, concerning police officers' use of compensatory time, and his pursuit of reinstatement with the Commission after his discharge in 2000. The same reasoning applies to Schlarp's service as the chairman of Detective Focareta's grievance committee. Retaliation for the exercise of rights protected under the Petition Clause is actionable even if the retaliatory act itself would not otherwise be unconstitutional. *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1177 (3d Cir. 1990); *Goldhaber v. Higgins*, 576 F.Supp.2d 694, 711-13 (W.D.Pa. 2007); *Thomas v. Hill*, 963 F.Supp. 753, 756 (N.D.Ind. 1997).

In *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006), the United States Court of Appeals for the Ninth Circuit stated that every citizen, regardless of his or her status as a public employee, has a First Amendment right to contact an elected official. This right is grounded in both the Free Speech Clause and the Petition Clause. *San Filippo*, 30 F.3d at 442 (recognizing speech directed solely at a governmental audience as protected under the Petition Clause). The conduct relating to communications with the federal district judge raised another consideration. A federal judge is not an *elected* official. U.S. Const., Art. II, § 2. Whether the several members of the Police Department who sent a letter to a federal district judge urging her not to order Chief Focareta's reinstatement engaged in conduct protected by the First Amendment is an interesting issue that the court need not resolve at this time. The court will assume for the purpose of resolving the pending motion that they engaged in activity entitled to First Amendment protection.

Implicit in the right to speak is a corresponding right to refrain from speaking. *Wooley*, 430 U.S. at 714. Since the court assumed Schlarp's colleagues had a First Amendment right to send the federal district judge a letter expressing their sentiments about the potential

reinstatement of Chief Focareta, it will be assumed that Schlarp had a corresponding right to refuse to sign that letter. By refusing to sign the letter prepared by other members of the Police Department, Schlarp will be assumed to have engaged in activity worthy of First Amendment protection – exercising his right to refrain from speaking. *Freitag*, 468 F.3d at 545 (recognizing a public employee's communications with a public official as protected under *Pickering*). This assumption does not depend upon whether Schlarp's refusal to sign the letter is properly characterized as pro-Focareta "speech" or simply an exercise of the right to refrain from speaking.[11]

Schlarp's claims stemming from his association with Chief Focareta, and the faction loyal to him, are properly classified as "expressive association" claims. "The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000). Where the "association" at issue is with a political party or with supporters of a particular political candidate, this requirement is easily satisfied. In contrast, where the relevant "association" is with a faction of public employees, the presence or absence of an expressive element may prove to be dispositive. Where, as here, a First Amendment claim is based upon both expressive conduct and on one's association with a particular political faction, "[t]he government's interest in appointing politically loyal employees to policymaking positions converges with its interest in running an efficient workplace."

---

[11]In *Ambrose v. Township of Robinson*, 303 F.3d 488, 495 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit made it clear that a plaintiff pursuing a First Amendment retaliation claim must establish that he or she actually engaged in conduct protected under the First Amendment. Because the First Amendment protects both an affirmative right to speak and a right to refrain from speaking, Schlarp's silence (i.e., his refusal to sign the letter) will be assumed to constitute conduct entitled to First Amendment protection.

*Curinga*, 357 F.3d at 312.  Consequently, the *Pickering* balancing test serves as the appropriate framework for decision making.  *Id.* at 310-14.

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court held that the First Amendment does not protect public employees from discipline for expressions made pursuant to their official duties.  The Supreme Court explained that "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government."  *Garcetti*, 547 U.S. at 423.  "When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees."  *Id.* at 424.  The more analogous expressive conduct is to expressions made by members of the general public, the more likely it is to constitute potentially protected speech "as a citizen."  Conversely, the more analogous expressive conduct is to expressions typically made only in accordance with a public employee's official duties, the less likely it is to be worthy of protection under *Pickering*.

Chief Focareta submitted a declaration stating that Schlarp, Kudranski and Schneiderlochner were leading participants in Plum's DUI enforcement operations, which were apparently opposed by Schmeck.  (App. to Pl.'s Counterstatement of Material Facts, Ex. P-20 ¶¶ 8-11.)  Schlarp presented evidence indicating that Kudranski, Schneiderlochner and he were subjected to retaliatory harassment because of their association with Chief Focareta.  (Joint Concise Statement of Material Facts (B) ¶¶ 29-32, 38-40, 43-46.)  He evidently believes that this evidence can be used to support his First Amendment claims with respect to the issue of causation.  The problem with Schlarp's line of reasoning is that his "association" with the faction

of officers loyal to Chief Focareta stemmed entirely from disputes about how his official duties should be carried out. With the exception of his decision not to sign the letter to the judge, Schlarp did not demonstrate his involvement in expressive conduct in support of Chief Focareta outside of his official duties. His participation in the DUI enforcement program cannot be fairly characterized as "expressive conduct." Even if it were expressive conduct, it would constitute speech pursuant to his official duties, which is not entitled to protection under *Pickering*. *Mills v. City of Evansville*, 452 F.3d 646 (7th Cir. 2006)(holding that a police officer's dissenting comments concerning a departmental policy constituted speech pursuant to her official duties). Schlarp's association with those loyal to Chief Focareta is not analogous to expressive conduct typically engaged in by members of the general public.[12] Consequently, the court's analysis will proceed with the understanding that the only constitutionally protected conduct engaged in by Schlarp was his testimony before the Ethics Commission, his filing of formal grievances, and his refusal to sign the letter to the federal district judge.

E.      **The Evidence Concerning the Issue of Causation**

Having adduced sufficient evidence to establish that he engaged in expressive conduct protected under the First Amendment, Schlarp must demonstrate that his protected conduct was a "substantial or motivating factor" in the Council's decision not to promote him. *Goodman v. Pa*

---

[12]The court acknowledges that in *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996), the Supreme Court observed that "one's beliefs and allegiances ought not to be subject to probing or testing by the government." *O'Hare Truck*, 518 US. at 719. This statement, however, was meant to reference situations in which a plaintiff was alleging that his or her employer had made a personnel decision based upon political affiliation under circumstances in which political affiliation was not an appropriate requirement for the position at issue. *Id.* ("*Elrod* and *Branti* involved instances where the raw test of political affiliation sufficed to show a constitutional violation, without the necessity of an inquiry more detailed than asking whether the requirement was appropriate for the employment in question."). To the extent that Schlarp's association with a particular faction within the Police Department reflects his views about how his official duties should be carried out, it is an appropriate subject for the Council to consider in determining whether to offer him a promotion.

*Turnpike Comm'n*, 293 F.3d 655, 673 (3d Cir. 2002). He cannot do so without first establishing that the Council was *aware* of his protected conduct. *Id.* at 670-73. Although both direct and circumstantial evidence may be used to make such a showing, Schlarp bears the burden of producing *some evidence* that the relevant decision makers knew – at the time the decision was made – about his testimony before the Ethics Commission, his filing of formal grievances, and his refusal to sign the letter to the federal district judge. *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).

Schlarp admitted that he has no independent knowledge that Dern or Taylor knew about his testimony before the Ethics Commission, or about his formal grievances, when they voted to promote Kapusta rather than him. (Joint Concise Statement of Material Facts (A) ¶¶ 34-35.) The four individuals who voted to promote Kapusta in 2005 were not on the Council when Schlarp engaged in this conduct. Schlarp attempts to impute knowledge of these events to Dern and Taylor by claiming that Flickinger had known about them, since he had been on the Council for the previous sixteen years. (*Id.*) Flickinger, however, did not vote to promote Kapusta. A jury would have to speculate in order to find that one of Schlarp's own supporters informed those in favor of Kapusta's promotion of incidents which might have made them less likely to support Schlarp for the promotion. *See Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 931-32 (7th Cir. 1995) ("[S]peculation does not meet a party's burden of producing some defense to a summary judgment motion. . . . Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")(citations omitted); *see also Geraci v. Moody-Tottrup Int'l, Inc.*, 82 f.3d 928, 932 )3rd Cir. 1996). Theories

and bald assertions do not rise to the level of substantial evidence for purposes of defeating a motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

It is insufficient for Schlarp to rely on assertions that the incidents were reported in the local media as a basis for establishing that Dern and Taylor knew about them. However important these events may have been to Schlarp, a jury cannot conclude that they were so widely known to have occurred unless the jurors engage in speculation. There is insufficient evidence to find that every informed resident of Plum had a specific awareness of those events.[13] *Alizai v. MVM, Inc.*, 40 F.Supp.2d 752, 756 n.2 (E.D.Va. 1998).

When Detective Focareta was demoted, Schlarp served as the chairman of his grievance committee.[14] (Compl. ¶ 34.) Schneiderlochner testified that, pursuant to the officers' employment contract with Plum, an officer pursuing a grievance has the authority to choose his or her own grievance committee chairman. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-4; Schneiderlochner Dep. 28.) A police officer chosen for this task is free to accept or reject the assignment. (*Id.*) It is not entirely clear from the record who serves on such a committee, although it appears from Schneiderlochner's testimony that at least one member of the Council is chosen for that purpose. (*Id.*; Schneiderlochner Dep. 29.) Schlarp testified that

---

[13]It would be reasonable for a jury to infer that a resident of New York City knew about the terrorist attacks of September 11, 2001, that a resident of New Orleans knew about Hurricane Katrina, or that a member of the United States Armed Forces knew about the wars in Iraq and Afghanistan. *United States v. Adedoyin*, 369 F.3d 337, 342 (3d Cir. 2004)("In this regard we can take judicial notice of the fact that by September 19, 2001, there had been massive publicity in the United States as to the Middle Eastern origin of the terrorists."). Schlarp's constitutionally protected activities, however widely reported they may have been in Plum's local media, simply do not rise to that level. Schlarp cannot ascribe to Dern and Taylor knowledge of his conduct without producing some evidence of their knowledge. *Ambrose v. Township of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).

[14]Schlarp participated in other grievance-related procedures on behalf of Detective Focareta and Schneiderlochner, but he has no evidence that Dern or Taylor were aware of his involvement in those activities at the time of the Council's decision to promote Kapusta. (Joint Concise Statement of Material Facts (A) ¶ 39.)

the individuals serving on the Council in 2002 would have received paperwork related to his service as the chairman of Detective Focareta's grievance committee. (App. to Concise Statement of Material Facts, Ex. D; Schlarp Dep. 94-95.) Although he indicated that he had attended a meeting with somebody on the Council, he could not remember who it was. (*Id.*) His basis for believing that Dern and Taylor knew about his service on behalf of Detective Focareta is limited to his testimony that the paperwork related to Detective Focareta's grievance procedures had been forwarded to the Council.[15] (Joint Concise Statement of Material Facts (A) ¶¶ 40-41.)

Schlarp argues that the Council knew about his refusal to sign the letter to the district judge, but his sole basis for this contention is the fact that counsel for defendants produced it during Schlarp's deposition. (Joint Concise Statement of Material Facts (A) ¶ 38.) Even if it could be inferred from defendants' production of the letter that the letter was in the *possession* of the Council as of the date that Kapusta was promoted, it does not follow that Dern or Taylor *knew* about the letter as of that date (or that Dern or Taylor knew that Schlarp had refused to sign it). While it is true that multiple inferences may be drawn from one set of facts, "an inferred fact may not be used as a basis for a further inference, thereby extending a chain of inferences into the realm of pure conjecture." *Hunter v. Shell Oil Co.*, 198 F.2d 485, 490 (5th Cir. 1952). The production of the letter may have simply come in response to Schlarp's allegation concerning the letter, which was articulated in his complaint. (Compl. ¶¶ 26-29.) Although the court must view

---

[15]Schlarp alleges that Dern called him a "trouble maker" for acting as Detective Focareta's grievance committee chairman. (Compl. ¶ 37.) He testified that Schneiderlochner had heard this comment repeated by Oft, who had attributed it to Dern. (Concise Statement of Material Facts, Ex. D; Schlarp Dep. at 96-97.) Dern denied that he had referred to Schlarp as a "trouble maker." (App. to Pl.'s Counterstatement of Material Facts, Ex. P-2; Dern Dep. 64.) Since Oft was never deposed, Schlarp cannot establish that Oft heard Dern make this comment.

the facts in the light most favorable to Schlarp, it does not follow that Schlarp can defeat the pending motion for summary judgment by creating an infinite chain of inferences to fill in the gaps left after discovery is completed.[16]  Since the burden of production rests on Schlarp, he cannot proceed with claims based upon his refusal to sign the letter without providing some evidence that the decision makers in question where aware of that refusal at the time of the challenged personnel decision.  *Ambrose*, 303 F.3d at 493.

The promotion of Kapusta resulted from a four to three vote of the Council.  Despite the involvement of seven individuals in the personnel decision at issue, Schlarp only deposed Dern.  Dern testified that he had been aware of Schlarp's firing of a gun in order to scare away dogs.  (App. to Pl.'s Counterstatement of Material Facts, Ex. P-2; Dern Dep. 34-35 (Feb. 1, 2008).)  Dern's awareness of this incident evidently influenced his vote.  Dern testified as follows:

> Q.  You indicated earlier that you had based your decision relative to Officer Kapusta and Officer Schlarp and their promotions on the recommendation of the chief, being Chief Payne; is that right?
>
> A.  Mm-hmm.
>
> Q.  And that was Chief Payne who--
>
> A.  Well, there was more to my decision than just his recommendation.
>
> Q.  Well, that's what I'm trying to get at.  So what else was there?

---

[16]Schlarp testified that he had served as Detective Focareta's grievance chairman in 2002 and 2003, shortly after Detective Focareta had been demoted.  (App. to Concise Statement of Material Facts, Ex. D; Schlarp Dep. at 94-95.)  He explained that the paperwork surrounding Detective Focareta's grievance had been forwarded to the Council during that period of time.  (*Id.*)  In his brief, Schlarp appears to argue that this testimony establishes that Dern and Taylor were aware of the letter to the federal judge(and his refusal to sign it) as of 2005.  (Docket No. 54 at 18.)  He, however, did not testify that the letter was included within the materials forwarded to the Council.  Under those circumstances, there is insufficient evidence in the record for a jury to conclude that all members o the Council knew about Schlarp's refusal to sign the letter.

A.      Well, the listings for the scores were extremely close.  I think seven-tenths of a point separated Schlarp and Kapusta.  So with that being close in score, I figured they were okay, either one of them.  But with what the Chief had said with his recommendation and what I knew of what happened with Officer Schlarp, in my opinion, that wasn't someone I wanted in an administrative, supervisory position that would pull his gun out like that.  I have an issue with that because I kept likening it to he pulls up to one of the middle school with two 13-year-old boys fighting.  In my opinion, he should get out and try to break it up.  With that happening, my opinion was that he'd get out and pull his gun out and shoot it in the air to try to stop them from fighting.  To me, that is unacceptable behavior for a sergeant.

Q.      Had you ever had any indication from any source that Officer Schlarp had ever committed any kind of infraction such as that in the course of his duty as a police officer?

A.      No.  It was worse.  He did it on his personal time.

Q.      Did anybody ever bring your attention the fact that there was testimony that the actual occurrence back in July of 2000 was that Mr. Schlarp was pursued by these dogs from whom he tried to escape until he could go no further and that instead of shooting them to protect himself, he fired into the ground to scare them off?

A.      The way that it was told was that his dog was larger, and it was a smaller dog and it never left the yard.

Q.      And nobody ever corrected your impression or nobody ever let you know that there was contrary testimony that, in fact, there were three large dogs pursuing Mr. Schlarp and his puppy across the street into a neighbor's yard?

A.      No.

*Id.*; Dern Dep. at 67-69.  Dern may have been mistaken about what had happened with respect to

Schlarp and the attacking dogs, but that mistake lacks constitutional significance.  Regardless

whether Schlarp's act of firing his gun was a legitimate self-defense measure or an ill-advised act

of rage, it was not expressive conduct entitled to First Amendment protection.  A personnel

action cannot be challenged on constitutional grounds merely because the reasons for that action

34

are alleged to have been based upon an unreasonable or unfair premise. *Connick*, 461 U.S. at 146.

Although the record contains evidence that Schmeck was hostile to Chief Focareta's supporters in a more general sense, the court already concluded that Schlarp's association with Chief Focareta did not constitute "expressive conduct" entitled to First Amendment protection. The only evidence relevant to the issue of causation is that which relates to Schlarp's constitutionally protected activities (i.e., his testimony before the Ethics Commission, his filing of formal grievances, and his refusal to sign the letter to the federal judge). Assuming that Dern and Taylor read the papers forwarded to the Council concerning Detective Focareta's grievance procedures (which evidently listed Schlarp as the grievance committee chairman), they knew that Schlarp had served as the chairman of Detective Focareta's grievance committee in 2002. The lapse in time between Schlarp's service on behalf of Detective Focareta in 2002 and the Council's decision to promote Kapusta in 2005 is simply too long to enable a reasonable jury to infer that Dern and Taylor voted to promote Kapusta (rather than Schlarp) because of Schlarp's petitioning activity.[17] *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001)(recognizing that a plaintiff can defeat a motion for summary judgment in the First Amendment retaliation context by showing a "suggestive temporal proximity" between his or her constitutionally protected

---

[17]In *Waters v. Churchill*, 511 U.S. 661 (1994)(plurality opinion), a plurality of the Supreme Court declared that "[a]n employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements." W*aters*, 511 U.S. at 681. Where a public employee engages in both protected and unprotected activities, the causation inquiry must be conducted in relation to the protected activities. *Deschenie v. Bd. of Educ.*, 473 F.3d 1271 (10th Cir. 2007); *Taylor v. Bartow County*, 860 F.Supp. 1526, 1542 (N.D.Ga. 1994). When Schlarp's protected activities are isolated from his unprotected activities, the court is left only with Schlarp's testimonial evidence that, three years before the personnel decision at issue, his name had appeared on papers sent to the Council in connection with Detective Focareta's grievance procedures. This evidence is insufficient to enable a reasonable jury to conclude that Schlarp's service on behalf of Detective Focareta was a substantial or motivating factor behind the Council's decision not to promote him. There is no evidence in the record which shows that Dern or Taylor knew about Schlarp's other protected activities.

activity and the adverse action alleged to have been retaliatory). Because Schlarp did not adduce sufficient evidence to establish that Dern and Taylor were aware of his other protected activities, he cannot show those activities were a substantial or motivating factor in their decision to promote Kapusta rather than him.[18]

The court acknowledges that Schlarp's initial burden is simply to show that his constitutionally protected activities were a "substantial or motivating factor" behind the Council's decision not to promote him, not to show that such activities were the sole cause of the Council's personnel decision. *Suppan v. Dadonna*, 203 F.3d 228, 236-37 (3d Cir. 2000). If Schlarp were able to make such a showing, the burden would shift to the defendants to prove that they would have made the same decision absent Schlarp's protected activity. *Id.* at 236. In this case, however, Schlarp cannot surmount the threshold hurdle of establishing that his protected conduct was a substantial or motivating factor behind the Council's decision to pass him over for promotion. Therefore, Dern and Taylor do not need to establish their same decision defense in order to obtain a judgment as a matter of law. In light of the court's determination that Schlarp

---

[18]Although not dispositive of the court's analysis, the record contains some circumstantial evidence that may undermine Schlarp's contention that Taylor and Dern voted to promote Kapusta for the purpose of retaliating against Schlarp for engaging in constitutionally protected activities. Kudranski testified that Kapusta had been a regular guest at Taylor's house. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-3; Kudranski Dep. at 18-19.) According to Kudranski, Payne had expressed frustration about Kapusta visiting Taylor when he was supposed to be performing work-related tasks. *(Id.)* This testimonial evidence suggests that Taylor's support for Kapusta may have been motivated more by a personal friendship with him than by a desire to retaliate against Schlarp for engaging in constitutionally protected activities. The court also notes that, on September 13, 2004, the Council changed the qualifications for an officer seeking a promotion to the position of sergeant to require an applicant to have four (rather than seven) years of previous service as a police officer. (App. to Pl.'s Counterstatement of Material Facts, Ex. P-8.) The motion to make this change was approved unanimously, after having been made by Dern and seconded by Russo. *(Id.)* Schlarp alleges in his complaint that the Council took this action specifically because it wanted to give Kapusta (who evidently had less than seven years of experience as a police officer) an opportunity to compete for a sergeant position. (Compl. ¶¶ 41-44.) At that time, the results of the civil service tests were not yet available, so the Council had no way of knowing that Schlarp would later be ranked second on the Commission's list of eligibles. Some members of the Council appear to have been predisposed to promote Kapusta if at all possible.

did not adduce sufficient evidence to establish that Dern and Taylor violated his First Amendment rights, the court need not consider whether Dern and Taylor would be entitled to qualified immunity if Schlarp had been able to establish a constitutional violation.

**F.      The Claims Against Plum**

Schlarp argues that he can proceed with his claims against Plum even if the claims against Dern and Taylor must be dismissed.[19]  It is undisputed that Plum is a "person" within the meaning of § 1983.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  A municipality cannot be held liable under a theory of *respondeat superior*.  *Id.* at 691.  To hold a municipality liable under § 1983, a plaintiff must demonstrate a *direct causal link* between a municipal action and the deprivation of a federally protected right.  *Brown*, 520 U.S. at 404.  Where a municipal action *itself* violates a federally protected right, or directs an employee to do so, such a direct causal link is easily established.  *Id.*  In this case, however, that principle is a double-edged sword.  Because the *municipal action* in question (i.e., the Council's decision to promote Kapusta rather than Schlarp) is the same *action* for which Schlarp attempts to hold Dern and Taylor liable, the court's determination that Schlarp cannot establish a constitutional violation perpetrated by Dern and Taylor means that he likewise cannot establish a constitutional violation perpetrated by Plum.[20]  *Mills v. City of Harrisburg*, 589 F.Supp.2d 544, 555 (M.D.Pa. 2008).

---

[19]In his brief, Schlarp mischaracterizes the Council's promotion decision as a "legislative act."  (Docket No. 54 at 14.)  The nomenclature used by Schlarp runs counter to his attempt to pursue claims against Dern and Taylor.  As noted earlier, Dern and Taylor are absolutely immune from personal liability for their "legislative acts."  *Bogan v. Scott-Harris*, 523 U.S. 44, 48-56 (1998).  Because the personnel decision made by the Council impacted no one other than the individuals seeking the promotion, it is properly classified as an "administrative" decision for which Dern and Taylor do not enjoy absolute immunity.  *Zdziebloski v. Town of East Greenbush*, 336 F.Supp.2d 194, 203 (N.D.N.Y. 2004).

[20]The court's resolution of the claims against Dern and Taylor is a merits-based decision.  The situation would be entirely different if the court had concluded that a constitutional violation could be established, but that Dern and Taylor were nevertheless entitled to qualified immunity.  A municipality cannot avail itself of the qualified

Schlarp's First Amendment claims against Plum are premised on the exact same action (i.e., the Council's decision not to promote him) that serves as the basis for his First Amendment claims against Dern and Taylor. Under these circumstances, it is clear that the dismissal of the claims against Dern and Taylor necessitates the dismissal of the claims against Plum.[21] *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)("This negative, it seems to us, was conclusive not only as to Officer Bushey, but also as to the city and its Police Commission. They were sued only because they were thought legally responsible for Bushey's actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent.").

## Conclusion

The evidence of record indicates that the members of the Police Department found themselves caught in the middle of an internal feud between two competing factions. The task of the court was to isolate those activities of Schlarp which were constitutionally protected and to determine whether a reasonable jury could conclude that *those particular activities* were a substantial or motivating factor behind the Council's decision to promote Kapusta rather than Schlarp. The evidentiary record before the court contains no evidence that Dern or Taylor knew that Schlarp had engaged in most of the activities which the court concluded would be constitutionally protected. Although there is some testimonial evidence supporting the assertion that Dern and Taylor may have known that Schlarp had acted as the chairman of Detective Focareta's grievance committee (an activity entitled to protection under the Petition Clause),

---

immunity available to its officials. *Owen v. City of Independence*, 445 U.S. 622, 638-57 (1980).

[21]By failing to amend his complaint to assert First Amendment claims against Hereda and Russo, Schlarp implicitly foreclosed any argument that he could establish they had violated his constitutional rights.

Schlarp's service in that capacity was too remote in time from the Council's decision to promote Kapusta to enable a reasonable jury to infer that it was a substantial or motivating factor behind the challenged personnel decision.

The court's inquiry in this case is limited to the question whether the Council's decision to promote Kapusta, rather than Schlarp, contravened the Constitution of the United States. Given the present state of the record, the court answers that question in the negative. Whether the Council's decision constituted a violation of Pennsylvania law is not before this court. No opinion is expressed about whether the Council's decision to pass Schlarp over for promotion contravened Pennsylvania law, or whether it was otherwise improper. It suffices to say that Schlarp cannot establish a violation of the Constitution. Accordingly, defendants are entitled to summary judgment.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: March 24, 2009